CITY OF DETROIT *v.* C. H. LITTLE CO.[1]

$$\begin{array}{cc} \overline{146} & \overline{373} \\ \text{f156} & {}^{2}117 \end{array}$$

1. EMINENT DOMAIN—GRADE CROSSING—SEPARATION OF GRADES— DAMAGES—LEASEHOLD OF RAILROAD PROPERTY.

The term of a tenant of railroad property is property for injury to which the tenant is entitled to compensation under sections 4229 et seq., 2 Comp. Laws, providing for the separation of railroad and highway grades, though the statute does not contemplate an award of damages to the railroad owning the property.

2. SAME—MEASURE OF DAMAGES.

In proceedings by a city under sections 4229 et seq., 2 Comp. Laws, to enforce separation of railroad and highway grades, the court is not in error in refusing to adopt as the measure of damages for interference with a leasehold of railroad property for business purposes, the value of the term less the rent reserved, since the claimant is entitled also to compensation for the interruption of his business, losses incident to the enforced change of location, expenses of removal, and the like.

3. CONTRACTS—VALIDITY—PUBLIC POLICY—RAILROADS—LEASE OF RIGHT OF WAY.

A lease by a railroad company of a portion of its right of way to a dealer in heavy articles of merchandise, made with a view to increasing shipments, is not against public policy.

4. EMINENT DOMAIN—GRADE CROSSING—SEPARATION OF GRADES— REMOVAL OF BUILDINGS.

A city having permitted the work of tearing up streets to be begun and the streets rendered impassable before taking the necessary legal proceedings for the separation of railroad and highway grades, and the owner of a leasehold, destroyed by the separation, having treated the city's unlawful proceedings as lawful, and moved his building before legal proceedings were begun, the city cannot claim that he voluntarily moved his buildings and is therefore not entitled to damages.

5. EVIDENCE—ADMISSIONS—ATTORNEY—FORMER TRIAL.

In a proceeding for the assessment of damages to a leasehold caused by the separation of railroad and highway grades, an

---

[1] Rehearing denied March 6, 1907.

admission made by petitioner's attorney for the purpose of expediting a former trial, to the effect that claimant's witnesses, if called, would testify that claimant's damages amounted to a specific sum, is properly rejected.

6. EMINENT DOMAIN—CONDEMNATION PROCEEDINGS — TRIAL — MIS-CONDUCT OF COUNSEL.

The verdict of the jury in condemnation proceedings will not be set aside for improper argument of defendant's counsel as to the damages recoverable where the court carefully gave to the jury the proper rules for the determination of the damages sustained, and instructed them to disregard the argument complained of, unless it is probable that the argument affected the verdict.

7. SAME—DAMAGES—INJURY TO LEASEHOLD.

A claimant of damages for injury to a leasehold caused by a separation of railroad and highway grades is entitled to compensation only for the damages due to the improvement on which his property abuts, the damages accruing to him from the improvement at other points, though greater than to other persons having occasion to use the same streets, being different from theirs only in degree and not in kind.

Appeal from the recorder's court of Detroit; Connolly, J. Submitted October 10, 1906. (Docket No. 40.) Decided November 13, 1906.

Petition by the city of Detroit for the separation of grades and the abolition of grade crossings over certain railroads, in which the C. H. Little Company was permitted to intervene and claim damages to a leasehold. From the order confirming the verdict of the jury, both parties appeal. Affirmed.

*P. J. M. Hally*, for petitioner.

*Willard E. Warner*, for respondent.

BLAIR, J. On July 3, 1903, the city of Detroit entered into an agreement with the Lake Shore & Michigan Southern Railway Company and other railway companies for the separation of grades at the intersections of the several streets in the district between Woodward and

Michigan avenues, inclusive, with the rights of way of said companies. On November 3, 1903, the common council, by resolution, declared it necessary for the public benefit to make the separation of grades in accordance with the plan prescribed in the agreement. On December 16th, the city filed its petition as commencement of judicial proceedings for the separation of grades in accordance with the provisions of chapter 102, 2 Comp. Laws. Respondent was not mentioned in the proceedings, but, on its petition, was permitted to implead and present its claim for damages.

On the 19th of April, 1901, respondent entered into a lease with the Lake Shore Company, for the term of one year, covering a strip of land of 50 feet frontage on the south side of Michigan avenue by 220 feet depth upon the right of way of said company. The company's warehouse fronted on Michigan avenue with its east side on the west line of Clark avenue. The lease provided for annual renewals, and was renewed on April 19, 1903. The lease provided that it might be terminated by the lessor at any time upon 60 days' notice, and further provided that the lands leased should be held " by said second party for the purpose only of receiving, storing, handling and shipping sewer pipe, cement or other freight coming to or shipped by the said second party over the railway of the said first party."

The work of separating the grades at intersections of the Michigan Central right of way, some 600 feet east of respondent's premises, was begun prior to respondent's removal of its buildings and property, and Michigan avenue from Clark and Scotten avenues east was practically impassable at that time. The work adjacent to respondent's premises under the Lake Shore contract was not begun, however, till September 22, 1903, several weeks after such removal. A further statement of facts will be found in *City of Detroit* v. *C. H. Little Co.*, 141 Mich. 637, in which case this court reversed the judgment of the recorder's court rendered upon the first trial of this matter.

A second trial has been had, resulting in a verdict and judgment for respondent of $474.76, and both parties have appealed to this court.

Counsel for the city insist that a verdict should have been directed in favor of the city for the reasons:

"(1) The statute does not contemplate an award of damages to a steam railroad, and, since in case of injury to a leasehold interest the damages are to be apportioned, the legislature has failed to provide damages for injury to the interest of a tenant of a railroad right of way.

"(2) The measure of damages is the value of the term less the rent reserved and there was no evidence of the value of the term.

"(3) The lease was against public policy, invalid, and respondent could obtain no rights under it."

1. This point is disposed of by our previous decision.

2. The court did not err in refusing to adopt as the measure of damages the value of the term less the rent reserved. *Grand Rapids, etc., R. Co.* v. *Weiden,* 70 Mich. 390; *Grand Rapids, etc., R. Co.* v. *Chesebro,* 74 Mich. 466; *Commissioners of Parks & Boulevards of Detroit* v. *Railroad* Co., 91 Mich. 291; *Same* v. *Moesta,* 91 Mich. 149, 154; *City of Detroit* v. *Brennan & Co.,* 93 Mich. 338.

3. This point is disposed of by *Michigan Cent. R. Co.* v. *Bullard,* 120 Mich. 416.

It was also contended by petitioner that, since respondent voluntarily moved its buildings before judicial proceedings were instituted to determine the necessity for the proposed separation of grades, it could recover no damages for such removal. Petitioner, having permitted the work of tearing up the streets to be begun and the streets to be rendered impassable before taking the necessary legal proceedings, is not in a position to object that respondent, in good faith, treated its unlawful proceedings as lawful and moved his buildings to lessen the damages.

Respondent contends that the court erred:

"(1) In refusing to receive evidence of an alleged ad-

mission of the amount of respondent's damages by petitioner's attorney on the former trial.

" (2) In permitting improper arguments to be addressed to the jury by counsel for petitioner.

" (3) In leaving the question to the jury whether or not the respondent was compelled to move by reason of the separation of grades.

" (4) In refusing to grant a new trial for the reason, among others, that the jury did not follow the uncontroverted testimony as to the amount of respondent's damages."

1. This point is disposed of by our previous decision. The admission was made for the purpose of expediting the trial, and was, in effect, that respondent's witnesses, if called, would testify that the damages amounted to $1,807.40.   The evidence was properly rejected.

2. We do not think the arguments of petitioner's counsel, of which complaint is made, if erroneous, could have prejudiced the jury so far as respondent's damages are concerned, in view of the charge of the court upon that subject, which respondent's counsel concede was correct. We do not think that verdicts should be set aside in such proceedings upon the ground of improper argument as to the damages recoverable where the court has carefully given to the jury the proper rules for their guidance, and instructed them to disregard the argument principally complained of, as in this case, unless it seems probable that such arguments affected the verdict.

3. Among other things, the court instructed the jury as follows:

" You are to say whether or not, as reasonable men, they were compelled to move by reason of the separation of grades. If they were compelled to move their warehouse, by reason of the separation of grades, you are to say, as reasonable men, under the evidence, what damage, what cost they were put to by reason of their moving.   Now, it is the claim of the petitioner here that there was no necessity imposed upon them by reason of the separation of grades to move at all from the old site; that is to say, they could have remained where they were and accommodated themselves upon the old site, to the new situation, and go on

doing business there just the same. That is a proper ele-
ment for you to consider in your award of damages,
whether or not they were under the necessity of moving
on account of the separation of grades, or of moving en-
tirely to meet the expanding and growing needs of their
business. What the statute contemplates is that they
shall be justly compensated for any injury they may have
received by reason of the separation of the grades, and by
reason of nothing else than that."

Respondent's counsel contend that the testimony of their
witness Tucker, that "they were handicapped for room
on the south side," etc., is only subject to the interpreta-
tion that such testimony related to the situation as it
would exist after the excavation in front of the premises
and with the building moved back on Clark avenue. We
do not regard this as a necessary view of the testimony.

The jury viewed the premises, and we think the court
did not err in leaving it to them to determine from such
view, from the fact that they moved the building back on
the lot before work began in front of the premises, from
the testimony of the witness and the surrounding circum-
stances, whether respondent did not move its buildings to
meet the demands of its expanding business.

4. The items of respondent's damages as claimed were:

| | |
|---|---:|
| To paid extra men under Torrey | $78 94 |
| To paid extra man under Taylor | 133 95 |
| To value of double teams for extra time | 1,236 00 |
| To value of single wagons for extra time | 484 40 |
| To value of various items of expense | 210 01 |
| To value of damage to building | 300 00 |
| Total | $2,443 30 |

Interest on the above total from February 1st, 1904, the
average date, $261.85, which, added to the above, makes
a total of $2,705.15.

The basis of the claim for damages "for extra time" of
teams was, as testified by the foreman of the south yard
and the man in charge of the teaming:

"We kept an average of two double teams and one
single wagon at that yard, and they would draw an aver-

age of six loads a day, each, from the south yard. After Michigan avenue became impassable, the hauls were much longer. From the south yard, we had to go south on Clark avenue to Toledo avenue, the first paved east and west street, then east or west on that avenue to the first paved street back to Michigan avenue and up that street to Michigan avenue again, making an extra distance of about two miles for each load. From the north yard we had to go north on Scotten avenue to Buchanan, the first paved east and west street, then east or west to the first paved street back to Michigan avenue, and down that street to Michigan avenue again, making an extra haul of about two miles for each load, just about the same extra distance on both sides of Michigan avenue. This extra distance for each load amounts to 12 miles extra travel for each team and wagon per day, or a loss of time which it takes the teams to go that extra distance. During the fall and winter of 1903–4 and the summer of 1904, Michigan avenue was in such shape that teams could not traverse nor cross it. We could not get from one yard to the other without going way around. * * *

"During the later part of the work of improvement, teams could drive through Michigan avenue on the south half of the avenue, but we could not cross it until it was completed, which was some time in September, 1904. * * *

"The single wagons ordinarily haul from 2,000 to 3,000 pounds to a load, and the double teams from 3,000 to 5,000 pounds per load. The teams have to keep on the paved streets with such loads. A double team with a man is worth 50 cents per hour, and a single wagon with a man is worth 40 cents per hour, the man in each case costing the same. In making deliveries from the south yard, on the south side of Michigan avenue during the time that Michigan avenue was impassable, the teams had to go south on Clark avenue to Toledo avenue, the first paved street running east and west, then east or west on Toledo to the first paved street running north and south, then north on that street back to Michigan avenue. From the yard on the north side of Michigan avenue, the teams had to go north on Scotten avenue to Breckenridge street, the first paved street running east and west, then east or west on that street to the first paved street running north and south, then south on that street back to Michigan avenue. This made an extra haul of about two miles

for each load.   A loaded team will not walk more than three miles per hour.   Toledo avenue is just about the same distance south of Michigan avenue that Breckenridge is north of it.   The teams returned by the same routes as going.

" To the south [of Michigan avenue there is a short street between Michigan and Toledo, but it is not paved, and between Michigan and Breckenridge there are some unpaved streets.   Our teamsters take the same route on the return as going.   I did not go with every load, but drove around from day to day in a carriage to keep track of the teams and men.   They could not deliver as many loads per day, going around the long way, as out by the way of Michigan avenue.   *   *   *

" I heard the testimony of Mr. Heiden as to the extra distances for the hauls and the extra time which it took, from which I have made the computations of the value of the teams and men for such extra time for an average of six loads per day for each team and wagon.   For the double teams this amounts to the sum of $1,236.   For the single wagons this amounts to the sum of $484.40.   I have computed it for the period of one year, as it took that long at least when Michigan avenue was impassable for our teams; i. e., from the latter part of August, 1903, into September, 1904.   It was a little longer than one year, but I have used that as a basis."

This testimony is not very satisfactory.   It does not appear how many loads were hauled during the year nor upon any given day, nor what route was traversed by any team, nor how far any particular team traveled, nor what the basis was of the witness' statement of the average number of loads, nor the weight of load that any particular team hauled, nor that all of the loads had to be drawn on paved streets, nor what time was consumed in returning with the empty wagons, nor what part of the extra haul was due to the separation of the Lake Shore grades alone, nor what effect, if any, the procuring of additional room upon the north side and the admitted expansion of the business had upon the number of loads hauled from the south side.   None of the teamsters were called, and a part of the testimony, at least, upon this subject was based upon hearsay.

Respondent was not entitled to recover any compensation for damages due to the separation of grades at the intersections of Michigan avenue or any other streets with the Michigan Central and Grand Trunk rights of way, but only for the Lake Shore improvement, upon which his property abutted. As to the other improvements, while the damages may have been greater to respondent than to others having occasion to use Michigan avenue, the difference was one of degree and not of kind.

Respondent's counsel admitted that they claimed nothing for loss of profits and it is fairly inferable from his statements that there had been no loss of profits. The judge who tried the case admitted it to the jury in a very fair, lucid, and comprehensive charge, and after considering respondent's motion for a new trial, said:

"The case was, in my judgment, fully and fairly tried by twelve intelligent and impartial jurors, and I can see no reason at this time to disturb their verdict."

We are not prepared to say upon this record that his conclusion was erroneous. The judgment is affirmed.

GRANT, MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred.